MERCANTILE CO-OPERATIVE BANK OF NEW JERSEY

*v.*

JENNIE P. GOODSPEED et al.

[Argued June 7th, 1904. Decided January 17th, 1905.]

1. Where a building and loan association undertakes to make a mortgage due for default, and files a bill to foreclose when it is in failing condition, and thereafter its receiver practically takes its place and conducts the suit, the case will be dealt with as if the bill had been filed by the receiver.

2. A defendant in foreclosure will not be allowed to amend his answer so as to get the benefit of an inequitable forfeiture, based on non-compliance of the mortgagee, a foreign corporation, with the requirements of the statutes imposing conditions upon which such corporations may transact any business in this state.

3. Defendants were borrowing members of a foreign building and loan association, and gave it a mortgage, which was transferred to complainant, a domestic building and loan association; and, by agreement of defendants, their stock in the foreign association was canceled, and they accepted an equivalent amount of stock in the domestic association.— *Held*, in a suit to foreclose, that the case would be dealt with as if the whole transaction had been between complainant and defendants.

4. On the foreclosure, by the receiver of a building and loan association, of a mortgage of a member, no part of the bonuses included in the mortgage will be allowed in favor of the mortgagee, in ascertaining the amount due on the mortgage; the association, because of its failure, being unable to carry out its part of the agreement as to the manner of repayment of the loan, which is the main consideration for the bonus.

5. Dues and fines secured by a mortgage to a building and loan association are, on foreclosure by the receiver of the association, to be considered part of the mortgage debt, to the extent that they were payable prior to the association's suspension of business.

On bill, answer and proofs.

*Mr. Sherrerd Depue,* for the complainant.

*Mr. Thomas C. Simonton,* for the defendants Goodspeed.

*Mr. Frank P. McDermott,* for the defendant Cloughly.

STEVENSON, V. C.

The following are my conclusions:

1. The receiver of the complainant corporation, a building and loan association, since the filing of the bill, has practically taken the place of the complainant and is conducting the suit. I do not think that the position of complainant's counsel is correct to the effect that all rights and equities were fixed at the time of the filing of the bill, and that the case should now be disposed of as if the complainant were still solvent and operating its business, and offering to its members, including the defendants Mr. and Mrs. Goodspeed, the advantages of their system. The inference is fair that at the time when the complainant undertook to make the mortgage due and file its bill of complaint in this cause the seeds of death were in it, and its enterprise in fact was a failure. Moreover, if the corporation were now

solvent and continuing its business, it is not clear that the defendants would not have an opportunity, according to the regulations and practices of the company, to pay up and reinstate in all respects their relations with the company as mortgagors and members. The case will be dealt with as if the bill had been filed by the receiver.

2. The defence of usury is not sustained. The only usurious agreement attempted to be set up in the answer of the mortgagors is an alleged corrupt agreement between the New York corporation, the original mortgagee, and Mr. and Mrs. Goodspeed, the mortgagors, in violation of the usury laws of New Jersey. I 'find that the original contracts are under the New York law. The answer does not set up usury under the New York law, and it is not claimed by anyone that the New York law governing building and loan associations, which was offered in evidence, did not fully authorize the agreements for interest and bonuses which were made.

3. The defences, based on non-compliance on the part of. the New York corporation with section 97 of our Corporation act, and chapter 251 of the laws of 1890, are not set up in the answer, and if they had merit could not be considered. The defendants certainly will not be allowed to amend their answer in order to get the benefit of an inequitable forfeiture, if such forfeiture could be claimed on the facts proved in this case. If the failure of the New York corporation to comply with these New Jersey statutes has any effect upon the mode of ascertaining the amount due on the mortgage, as counsel for the defendants seems to think, no amendment of the answer is necessary to give the defendants the benefit of any such result.

4. I think this case must be dealt with in precisely the same way as if the whole transaction from the start had been between the complainant, the building and loan association incorporated under the laws of New Jersey, and the mortgagors, Mr. and Mrs. Goodspeed. These mortgagors, originally, were borrowing members of the New York building and loan association. When the mortgages were transferred by the New York corporation to the New Jersey corporation, and the stock of the Goodspeeds in the New York corporation was canceled, and they subscribed for and

took stock to the same amount in the New Jersey corporation, what in fact occurred was a substitution of the New Jersey corporation for the New York corporation. Both were building and loan associations. No difference has been pointed out in respect of the law governing them, and their minute codes of by-laws, setting forth complex and elaborate methods of business, appear to be identical. The only difference between what took place and what would have taken place, if by the consent of all parties interested the New York corporation had moved into New Jersey and come under the New Jersey law, seems to lie in the fact that the advantages of borrowing members in the two corporations were probably not the same. It appears that the New York corporation went into liquidation first. But the complete answer to this suggestion is that Mr. and Mrs. Goodspeed agreed to the substitution and surrendered their stock in the one corporation and accepted an equivalent amount of stock in the other. The only fact, I think, which calls for a discrimination between the two corporations in the work of ascertaining the amount due on the mortgage is the payment of $190, which appears, as the proofs now stand, to have been made by Mr. Goodspeed to the New York corporation after the transfer of the mortgages and the complete substitution of the New Jersey corporation for the New York corporation had been effected. The master may take any further testimony, however, as to this payment, and also inquire and report as to the other payments (two in number, I think) alleged to have been made by the mortgagors and disputed by the receiver.

5. In ascertaining the amount due the receiver will not be allowed the benefit of the two bonuses included in the mortgages, amounting to $5,800, or any interest thereon. The amount of the monthly bonus of twenty-five cents per share, to the extent that it was actually paid by the mortgagors, will be credited to them as a payment on their debt. In dealing with these bonuses I am constrained to regard the law, so far as this court is concerned, as settled by the two cases of *Weir* v. *Granite State Provident Association,* 56 *N. J. Eq.* (*11 Dick.*) *234,* decided by Vice-Chancellor Reed in 1897, and *Hoagland* v. *Saul,* 53 *Atl. Rep.* 704, decided November 22d, 1902, by Vice-Chancellor

Grey. I think that these cases control the present decision in regard to this matter of bonuses, notwithstanding what is said by Vice-Chancellor Pitney in his brief oral opinion, in *Whitehead* v. *Commercial Building and Loan Association, 64 N. J. Eq.* (*19 Dick.*) *24.* The learned vice-chancellor, in the latter case, does not discuss the important distinction between the status of dues and the status of a bonus in cases of this class. Moreover, while the case was apparently decided about a week after *Hoagland* v. *Saul,* it is evident that the opinion in the last-mentioned case had not yet anywhere been published.

Counsel for the receiver argues that if the whole amount of the bonuses cannot equitably be allowed, the court should permit only a *pro rata* abatement, based on a comparison of the estimated period of the loan according to the terms of the original contract, with the shorter period during which the loan was in fact retained, and in support of this view he cites the case of *Towle* v. *American Building, Loan and Investment Society, 61 Fed. Rep. 446.* I cannot find a sound basis for any such apportionment. There are authorities and reasons to sustain the proposition that the entire bonus should be allowed, and there are also authorities and reasons which sustain the proposition that the entire bonus should be disallowed. When both of these simple but contradictory rules, which are perfectly easy of application, are discarded, and an attempt is made by the court to frame a new bargain which the parties might or might not have been willing to make, a great deal of difficulty is naturally to be expected.

As I understand the authorities which favor the disallowance of the bonus in part or in whole, the case is regarded as one of failure of consideration. The question seems to be whether such failure of consideration is to be deemed a total failure or as only a partial failure, in respect of which a court of equity can in some way make a just and fair apportionment.

Building and loan associations are allowed by law to take premiums from their borrowing members, which between other parties would be usurious, not merely, I think, because of the advantage of the loan—the advantage of the use of the money— or the advantage of what is called "priority" in respect of the

right to borrow the funds of the association. The premiums are the price which the borrower pays, not only for the loan, but for the supposed advantageous provisions for the *repayment* of the loan which the attractive systems of these associations hold out. It is notorious that scores of inexperienced persons are induced to pay most extortionate bonuses—far beyond what they could be in any way induced to pay to an ordinary lender of money for a loan—because they are led to believe that under the system of the building and loan association into which they enter they can wisely and profitably pay a bonus which if paid to the ordinary lender of money they would regard as extorsive and improvident. In the present case the bonuses which were added to the mortgage amounted to $5,800, and in addition the borrowers agreed to pay a further monthly bonus of twenty-five cents on each of their shares. The actual amount of money advanced by the original building and loan association was $6,000. Now, it seems to me that the attempted apportionment of the bonus, or *pro rata* abatement of it, for which counsel for the receiver argues, is based upon the erroneous idea that in these peculiar mortgages made by borrowing members to building and loan associations, the bonus in fact is paid for the advantage of the loan precisely as in an ordinary case, where, for instance, the lender and mortgagee is a savings bank or a natural person. In such ordinary case, if a situation is brought about, by agreements or otherwise, in which the loan is repaid before the end of the period originally contemplated, an apportionment of a bonus, based on the actual period of the loan, as compared with the period originally agreed upon with reference to which the bonus was charged, would seem to be entirely equitable. The borrower, a corporation, for instance, which is not allowed by law to plead usury, having paid a bonus for a loan for one year, and having subsequently been obliged to pay the loan at the end of six months, certainly ought not to demand back the whole of the bonus—manifestly, such borrower ought to pay half the bonus for a loan for six months which was agreed upon as proper for the same loan for a year. A bonus, in all these ordinary cases of loan, is merely interest; it is merely money paid by the borrower to the lender for the use of the money loaned, and the

extent of the use is determined by the period of the loan. In the case, however, of a loan from a building and loan association, the main consideration for the payment of a premium, often, if not usually, is not the loan, but the opportunities for its repayment in a convenient and highly advantageous manner which are held out to the borrowing member.

That this proposition is true as applied to the present case is strongly indicated by some features of the transaction which I have not mentioned. The original mortgage was for $18,000, composed of $6,000 of loan, $2,000 of bonus and $10,000 the amount of an existing first mortgage held by an insurance company and drawing interest at five per cent., which mortgage, however, the building and loan association only assumed to take care of as long as the mortgagors kept up their payments. This first mortgage is of the class which generally remains undisturbed indefinitely. The building and loan association, however, collected interest monthly at the rate of six per cent. per annum on this $10,000, and also collected monthly a bonus on the one hundred shares which represented this sum, amounting to $300 per annum, while the association paid over only five per cent. per annum semi-annually to the insurance company. The borrowing members subscribed, in all, for one hundred and eighty shares. Is it not plain that the $2,000 of bonus, and the further bonus of twenty-five cents per share per month, amounting to an annual bonus of $540, were not paid merely as interest or for the prior right to borrow and use $6,000 of the funds of the association, but that the main consideration to the mortgagors for the payment of these large sums of money was the means which the mortgagee undertook to maintain for the gradual and complete discharge of the entire indebtedness of the mortgagors, including the $10,000 due to the insurance company? Whether in case the transaction as contemplated had been pursued to a finish, and the entire mortgage indebtedness had been paid off by maturity of the shares, the mortgagors would in fact have been benefited by the performance of a prudent contract on both sides, or would have been the victims of an unconscionable contract which they did not understand, is a question not to be discussed in this case. I am not pointing out that the mort-

gagors, by being brought into a complex mathematical system which they have not understood, have been deluded into making an unconscionable contract. That might be true in the case of an ordinary loan from a money lender not having the advantageous position of a building and loan association. What I am endeavoring to point out is that this case indicates that the main consideration for these enormous payments, made and agreed to be made on a contract for the use of money, must in fact have been not merely the use of the money, or the prior right to use the moneys of the association, but the maintenance by the lender of its system for the repayment of the entire mortgage debt, including the $10,000 mortgage held by an outside party. When such a system breaks down utterly, in a case like this, there seems to be very little left of the consideration for the payment of the bonus of $5,800, and no rule of apportionment by which a fair bonus for the loan of $6,000 for the brief period of that loan can be fixed.

In order that the nature and extent of the moneys paid and agreed to be paid by the borrowers in this case over and above ordinary legal interest may be fully understood, the transaction should be viewed in its final form. The mortgage for $18,000 is dated November 30th, 1897. In October, 1898, ten months later, the mortgagors, finding their monthly payments inconvenient to meet, a new deal was made. No more money was loaned, but a new mortgage was made for $21,800, which included the $18,000 covered by the first mortgage and an additional bonus of $3,000. The mortgagors were placed in a different class of members and the amount of their monthly dues on their shares, which were increased from one hundred and eighty to two hundred and eighteen, was reduced, while the monthly bonus was continued at the original figure of twenty-five cents per share, so that the annual amount of such bonus became $654. I do not pause to endeavor to calculate the time when the shares under the new arrangement would probably mature and the loan be paid, but the period, presumably, would be a great many years, unless the operations of the company were extraordinarily successful. It must be conceded that if the association managed successfully very many such loans as the one that these

defendants were induced to contract with it, large dividends would soon be payable. A calculation of what these borrowers agreed to pay for an alleged prior right to borrow $6,000 of the funds of their association, and for the enjoyment of the alleged extraordinary facilities which the association agreed to provide for the discharge of this indebtedness and the discharge of $10,000 owing to another creditor, seems to justify the inquiry whether this is not a case not only of an unconscionable contract, but of a fraudulent contract. It might be questioned whether Mr. and Mrs. Goodspeed were not in fact deluded by the falsehoods which figures tell into making a contract analogous to the historic contract for shoeing the horse. But, altogether, aside from any such possible view of this case, it is enough for my present purpose to indicate how throughout all the complexities of the contract relations between these building and loan associations and their borrowing members, Mr. and Mrs. Goodspeed, the idea dominates that these perhaps mistaken and misguided persons paid and agreed to pay these sums of money, which were so enormous in proportion to the amount of money which they borrowed, not merely in consideration of the loan or of any prior right to make the loan, but mainly in consideration of the special facilities for the payment of the loan, and of another and larger loan to a third party, which the association contracted to maintain.

When, as the result of a contract between two parties which has failed, money is left in the hands of either belonging to the other, I think the usual rule is that an implied contract is raised to pay over the money to the rightful owner, and generally with legal interest, certainly with nothing more. The view, however, seems to be entertained that a court of equity in the case of these peculiar contracts with which we are dealing should not hesitate to proceed and frame a contract according to its own notions which the parties by an equitable fiction may be presumed to have made. If the views which I have indicated of the nature of the consideration of the agreement for the bonus are correct, the first step must be to apportion the entire bonus, so as to discover what part of it the borrowing member is to be deemed to have agreed to pay strictly for the use of the money and what part he

is to be presumed to have agreed to pay for the full enjoyment of the scheme for the final repayment of the entire loan. Certainly this first thing to be done involves a great deal of difficulty, especially in a case like this, where the bonus exceeds the loan and a large part of the consideration, for the agreement to pay the bonus must have been the agreement of the association with respect to the $10,000 mortgage. If, however, this difficulty is obviated, or the court is to proceed without regard to it, it would seem to follow that the abatement of one part of the bonus is to be made strictly with reference to the curtailment of the period of the loan as originally fixed by the terms of the contract, while the abatement of the other part of the bonus is to be made strictly with reference to the actual payment on the loan which will be effected by the share which the borrowing member will receive upon distribution of the assets. The first abatement may be made in fixing the amount of the mortgage debt, but it is plain that the second abatement cannot be made until the business of liquidation has been carried to the last step and nothing is left but to calculate and distribute the dividends which the members are to receive.

In case any apportionment of the bonus should be attempted in this case, probably it would appear equitable to most minds that ten-sixteenths of the bonus should be deducted at some stage of the calculation, because $10,000 of the $16,000 nominal mortgage debt in no way was received by the mortgagors or paid by the association.

There are various questions in regard to the equity of charging a borrowing member with any share of his bonus determined by the dividend which he receives, but these questions I do not intend to discuss. It may be urged that if the borrowing member has received in dividends fifty per cent. of the amount of his loan, the means of repaying his loan must have been so far successful as to warrant an equitable charge against him to the extent of fifty per cent. of the bonus, after allowing him an equitable credit on the bonus based upon the curtailment of the period during which, under the original agreement, he had a right to the use of the money. If it can be ascertained by a calculation that the borrowing member, under the original con-

tract, would probably hold the loan for eight years, and upon liquidation at the end of four years he receives a dividend equal to one-half the loan, it may be insisted that he ought to pay in equity one-half the estimated part of the bonus which he paid for the loan and one-half of the estimated part of the bonus which he paid for the use of the means of repaying the loan. One charge would be naturally ascertained in fixing the amount due on the borrowing member's mortgage, and the other charge would be ascertained in adjusting the amount of his dividend on final distribution.

Assuming that the argument which I have endeavored to state is entirely sound, the fundamental difficulty still remains that the important alluring consideration which these building and loan associations offer to induce their borrowing members to pay these enormous bonuses is the promise to maintain a complex system, which the borrowing member frequently is incapable of comprehending, by which insensibly and with very little burden to himself such member in the course of years will be enabled to pay a very much greater sum than that which he borrowed, with less difficulty than he would find in repaying the exact amount of the loan, with lawful interest, to an ordinary mortgagee, such as a savings bank. The fact that the borrowing member is a participator in all profits may make a most unconscionably usurious contract appear reasonable and fair to persons unskilled in financial transactions and unable to understand complicated mathematical calculations. If the most of the members are borrowing members, and all of them or large numbers of them pay extraordinary bonuses on substantially the same scale, the possibility that large profits will counterbalance large bonuses certainly is increased. This condition of affairs indicates that it is the continuation of the system that constitutes the main element of the consideration of the promise to pay the bonus.

I fail to find a safe basis for any apportionment of the bonus in cases of this class, because there seem to be no data upon which to proceed in determining how much of the bonus the borrowing member agrees to pay for the use of the money and how much he agrees to pay for the enjoyment of the advantages of the system of the building and loan association for the gradual

and easy repayment of the loan. Until this preliminary division of the bonus into its two elements has been made, no proportionate abatement of either part seems to be possible on any rule which has been suggested. If such division could be made, then, in large numbers of cases, including I think the one at bar, the ascertainment of the original duration of the loan as contemplated by the parties, which any abatement of the bonus or a part of the bonus absolutely requires, would contain, it seems to me, a very considerable element of guesswork. It would seem, therefore, that the consideration upon which, with the sanction of the legislature, the building and loan association has been permitted to enter into a contract with its borrowing member, which without such sanction would be usurious and illegal, must be deemed to have failed. It would also seem that such failure of consideration must be deemed to be total, in the absence of any principle or rule by which the amount of the consideration which did not fail may be ascertained. The bonus, in fact, is agreed to be paid in consideration of the entire contract—the sum total of advantages, including the use of the money which the borrowing member is entitled to receive during the whole period covered by the repayment of the loan. So far, my consideration of the subject—such consideration having extended beyond the particular illustration of extortion and hardship presented in this case—has led me to the conclusion that on the whole justice will be promoted by denying to building and loan associations their special privilege to exact usurious interest unless they carry out completely the bargain, oftentimes complex and deceptive, which they induce the borrowing member to make.

It may be conceded that no rule for cases of this class—perhaps not even any rule prescribed by a statute—can secure equality between all the members of both kinds. I incline to think that the nearest approximation to equity will be realized if all the members—those who only share in bonuses and those who both pay and share in them—are notified that the association can only earn and hold a bonus in case it maintains its system for the benefit of the member who has paid the bonus until he has received the full consideration upon which the bonus was paid. This rule regards the borrowing member as standing

before the court in two distinct capacities. As a member he loses equally with his fellow-members. As a borrower he is dealt with as a stranger—as a party whose rights and liabilities depend upon contracts express and implied between himself and the association. This present case illustrates the difficulty of applying any other theory, and particularly the extreme difficulty in many instances of ascertaining the probable duration of the loan as contemplated by the parties to the original contract, which is the first fact to be fixed as the basis of any possible apportionment of the bonus.

It may be conceded that cases frequently occur, as is indicated in the reports, where the elements of the problem are comparatively simple, and an apportionment of the bonus seems to be practicable and more in accord with equity than the deduction of the entire bonus. Perhaps a special rule for such apportionment, strictly limited to the class of cases which I have indicated, may yet be evolved. If, however, a general rule is to be applied to all cases, it seems to me that an apportionment of the bonus upon any equitable principle applicable to all cases is impracticable, and I doubt whether any correct definition of a class of cases to which a rule of apportionment can equitably be applied could be framed, although that is not a matter which I have undertaken to consider.

I have discussed this subject of a possible apportionment of the bonus under examination in this case because the contract of the mortgagors is complex and the equitable considerations in favor of an apportionment were strongly urged in the argument.

The exact point now decided, however, is that in this case no part of the bonuses will be allowed in favor of the mortgagee in ascertaining the amount due on the mortgage.

6. The dues and fines paid by the mortgagors constitute a contribution to the capital of the enterprise in which they were jointly engaged with the other members—an enterprise in many respects resembling a partnership. Under the rule adopted in the above cases these moneys cannot be treated as a payment on the mortgage debt. They are paid by the borrowing member as member and not as borrower. They grow out of the member's

relation to the corporation as a member, not out of his relations to the corporation as a debtor under a contract of loan.

In regard to dues and fines which were payable prior to the suspension of the business of the corporation, it would seem that equity requires that, as they are secured by the mortgage, they should be made a part of the mortgage debt collectible in this suit. In *Hoagland* v. *Saul,* the dues secured by the mortgage payable in the future up to the maturity of the stock, and which presumably would have been paid, and certainly would have been collectible if the business of the corporation had continued, were not allowed as a part of the mortgage debt. Such dues are not earned. But it does not appear that in *Hoagland* v. *Saul* there were any back dues owing at the time of the suspension. The reason for making the back dues collectible on the mortgage is manifest: all the members of the association must be charged with their dues in proportion to their shares down to a common date. Borrowing members who have failed to pay their dues certainly ought not to have an advantage over their fellow borrowing members who have kept their dues paid up. Vice-Chancellor Grey seems to intimate in *Hoagland* v. *Saul* that the adjustment of all equities among the members "arising upon payment or non-payment of dues" can be attended to at the final distribution of the assets. In this case, I understand, the receiver will distribute a substantial sum. Whether these mortgagees are to be charged with their back dues and fines down to the suspension of business or some other common date in ascertaining the amount due on their mortgage, or whether such charge is to be made by the receiver against their dividend, seems to be a matter of no importance. However, unless counsel agree, I will hear them in regard to this matter and determine it on settlement of the decree.

7. The issues in regard to the status of the mortgage of the defendant Cloughly and the amount due thereon, and the alleged equity of this defendant against the complainant in respect of a certain chattel mortgage, appear to have all been settled by consents and admissions of the parties, which appear in the proofs. The decree will therefore establish this mortgagee's status in accordance with these admissions and consents, and the amount

of principal and interest being admitted, the master will merely have to carry down the interest calculation.

I do not think that there are any other matters presented by the pleadings and proofs in this case which require to be noticed at the present time. The complainant will take the usual decree, including a reference to a master.